The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Robert Pasqual SERRAVO,
Defendant–Appellee.

No. 89CA0318.

Colorado Court of Appeals,
Div. I.

April 12, 1990.

Rehearing Denied May 3, 1990.

Certiorari Granted Oct. 9, 1990.

Robert R. Gallagher, Jr., Dist. Atty., James C. Sell, Chief Deputy Dist. Atty., Englewood, for plaintiff-appellant.

Fogel, Keating & Wagner, P.C., Steven R. Polidori, Anthony D. Hall, Denver, for defendant-appellee.

Jane S. Hazen, Fairplay, for amicus curiae, Colorado Crim. Defense Bar.

Opinion by Judge PIERCE.

A jury verdict found defendant, Robert Pasqual Serravo, not guilty by reason of insanity of attempt to commit first degree murder. The People appeal on a question of law concerning an instruction given the jury. We approve the trial court ruling.

The record shows that defendant had become preoccupied with delusions that he was on a mission from God to establish a community for evangelizing his religious ideals. However, he felt his wife was not supportive of his plans and that it was God's will that he kill her to prevent her from being an obstacle in his way.

Defendant stabbed his wife in the back while she was sleeping. The wound, however, was not fatal. Seeing his wife stir, defendant felt compassion towards her and he became of the belief that her survival meant that she had passed a divine test and would no longer be uncooperative. He, therefore, sought to save her life and, accordingly called the police. Experts explained this behavior as being the result of some reality testing which remained intact and set in after the stabbing.

At trial, it was undisputed that defendant was mentally ill when he committed the crime. However, the People objected to the following instruction:

"As used in the context of the [statutory] definition of insanity [as a criminal defense], the phrase 'incapable of distinguishing right from wrong' includes within its meaning the case where a person appreciates that his conduct is criminal, but, because of a mental disease or defect, believes it to be morally right."

The People contend that the trial court erred in giving that instruction because it applies a subjective moral standard to the

determination of whether defendant understood right from wrong. We disagree under the circumstances of this case.

Section 16–8–101, C.R.S. (1986 Repl.Vol. 8A) provides that:

"(1) The applicable test of insanity shall be, and the jury shall be so instructed: 'A person who is so diseased or defective in mind at the time of the commission of the act as to be *incapable of distinguishing right from wrong* with respect to that act is not accountable. But care should be taken not to confuse such mental disease or defect with moral obliquity, mental depravity, or passion growing out of anger, revenge, hatred, or other motives, and kindred evil conditions, for when the act is induced by any of these causes the person is accountable to the law.'

"(2) The term diseased or defective in mind, as used in subsection (1) of this section, does not refer to an abnormality manifested only by repeated criminal or otherwise antisocial conduct." (emphasis added)

Section 18–6–101 is a legislative codification of the commonlaw *M'Naghten* rule of insanity. *People v. Low*, 732 P.2d 622 (Colo.1987). The focus of the *M'Naghten* rule is on the cognitive aspect of a person's personality and that person's ability to distinguish right from wrong. W. LaFave & A. Scott, *Substantive Criminal Law* § 4.2 (1986).

The *M'Naghten* case itself does not answer the question of whether "wrong" means legal or moral wrong, and there is a split of authority on the issue in the state courts which apply the *M'Naghten* rule. W. LaFave & A. Scott, *Substantive Criminal Law, supra.*

The majority of the states apply a moral standard of wrong judged by societal mores, not by a person's personal views. We conclude that the language of § 16–8–101 reflects the General Assembly's intent to define wrong under a societal standard of moral wrong. Yet, as society's moral judgment is usually identical to the legal standard, the test is not broadened much if "wrong" is determined by a societal moral standard. Under this analysis, it has been noted that under circumstances in which:

"[a] mother kills her infant child to whom she has been devotedly attached. She knows the nature and quality of the act; she knows that the law condemns it; but she is inspired by an insane delusion that God has appeared to her and ordained the sacrifice. It seems a mockery to say that, within the meaning of the statute, she knows that the act is wrong." *People v. Schmidt*, 216 N.Y. 324, 110 N.E. 945 (1915).

Consequently, we adopt an exception that has been drawn by other jurisdictions in situations in which a person commits a criminal act, knowing it is illegal and morally wrong according to society's standards but, because of a mental defect, believes that God has decreed the act. *See State v. Crenshaw*, 98 Wash.2d 789, 659 P.2d 488 (1983). This "deific decree" exception to the societal standard of moral wrong is to be distinguished from the case in which a person acts in accordance with a duty imposed by a particular faith. *State v. Crenshaw, supra.*

Here, in an attempt to cover up his act, defendant initially told police that an intruder had stabbed his wife. The intruder story is evidence that defendant recognized that to kill his wife was against the laws of society. Thus, the evidence supports a finding that defendant knew that society considered murder to be morally wrong. However, other evidence indicated that, because of a mental disease or defect, he was inspired by an insane delusion that God had decreed the act. Thus, the evidence suggests that an instruction concerning the deific decree exception was appropriate to avoid confusing the jury. Hence, we conclude that the trial court did not err in giving the instruction.

The ruling of the trial court is approved.

STERNBERG and PLANK, JJ., concur.